UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JOSEPH MORELLI

**DEFENDANT'S SENTENCING MEMORANDUM**
CASE NO.: 22-CR-115 (BKS)

## PRELIMINARY STATEMENT

On February 1, 2023, Joseph Morelli pled guilty to all three counts in the indictment charging him with Interstate Threatening Communications in violation of 18 U.S.C. §875(c). Joe is scheduled to be sentenced on July 7, 2023. In anticipation of sentencing, a Pre-Sentence Report (hereinafter "PSR") was prepared by the Probation Department. The PSR calculates Joe's total offense level to be 17, with a criminal history category of I. The PSR provides that this results in a Guideline range of imprisonment of 24-30 months. Defense counsel submits that Joe's total offense level is 10, which when paired with a criminal history category of I, would result in a Guideline range of imprisonment of 6-12 months. This memorandum is submitted on behalf of Joe Morelli to aid the Court's review of the sentencing Guidelines and in support of his motion for a below-Guideline sentence of time-served with a term of supervision to follow.

## ARGUMENT

### I. Role of the Guidelines

The Supreme Court's decision in *Booker* held that the Guidelines are merely advisory, empowering the courts to take a more holistic approach in assessing the defendant and in determining an appropriate sentence. *See United States v. Booker*, 543 U.S. 220 (2005). The requirement that the courts must consider the sentencing Guidelines is balanced by Congress's mandate that courts impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). The Guidelines are not a substitute, and cannot be used as a substitute,

1

for the sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009); *Spears v. United States*, 129 S. Ct. 840 (2009). Specifically, the Court in *Nelson* held that "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson*, 129 S. Ct. 890, 892. Going even further, the Court clarified the role of the Guidelines, "the Guidelines are not only *not* mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* A sentencing court may not rely on the Guidelines range as a default to be imposed, unless a basis exists to impose a sentence within that range. Instead, the court must weigh the statutory factors in imposing a sentence that constitutes the least amount of imprisonment necessary.

## II.    Joe's background and characteristics

Born to two working-class parents in a blue-collar neighborhood in Buffalo, New York, Joe's childhood was marked by periods of mental health crises and family turmoil. Joe's father would often have angry outbursts and act out in violent ways. Joe recalls his father throwing a toolbox across the room during an outburst, almost hitting him and his mother. At the time of the toolbox outburst, his sister was just an infant safely tucked away in her crib, and his brother was upstairs, hiding. Joe was left alone to process this traumatic event in the context of all the other violence and emotional abuse he witnessed as a child. Joe would go on to witness his father physically abuse his mother, one time hitting her so hard that he broke her nose. The physical abuse was in addition to the ongoing emotional abuse and control.

After subjecting the family to violence and chaos, Joe's father left home for good when Joe was six years old. Although his father's exit was somewhat of a relief to Joe, his problems did not end there. Joe would go on to exhibit signs of mental health issues which would go untreated for years, due to no fault of his own. When he was seven years old, he had his first suicide attempt. When he was sixteen years old, he continued to struggle with anxiety and paranoia. This led to another suicide attempt. After this attempt, he spent three days in the ICU physically recovering, and then an

additional six weeks in psychiatric centers. Still not receiving any type of formal diagnosis or plan for aftercare, Joe continued to struggle with his mental health. Finally, at the age of twenty-five, he was diagnosed with depression and prescribed medication to help with this diagnosis. Life continued to wear on Joe, and when he turned thirty, he separated from his wife, who would later go on to alienate him from both of his children. A tense custody dispute took a further toll on his mental health.

Frustrated and upset with being prevented from seeing his children, Joe's depression worsened, and he was eventually hospitalized until a new medication was prescribed. At thirty-eight, Joe had a year-long manic episode until he engaged in inpatient mental health treatment, including electroconvulsive therapy. It wasn't until his participation in inpatient mental health treatment that he finally received a correct diagnosis of bipolar disorder. After being released from inpatient, his mental health took a turn for the worse, and he again attempted suicide. As is often the case for individuals with mental health diagnoses, Joe went through periods of relapse and periods of control. The cyclical nature of bipolar disorder has been a challenge throughout Joe's life as he navigates between periods of depression and periods of mania.

Joe has continued to receive mental health treatment and has been an active participant in this treatment. He takes several mental health medications and has done electroconvulsive therapy (ECT) numerous times in efforts to ease the symptoms of bipolar disorder. ECT involves an electric current being sent through the brain to cause a seizure. It is theorized that the seizure changes the brain's chemistry, thereby easing the symptoms of bipolar disorder. *See* https://nyulangone.org/conditions/bipolar-disorder-in-adults/treatments/electroconvulsive-therapy-for-bipolar-disorder-in-adults. ECTs are performed at a hospital under general anesthesia. Several small electrodes are placed on the individual's scalp to deliver the electric current and cause the seizure, which can last up to a minute. Recovering from the ECT is no walk in the park, as oftentimes individuals can suffer from headaches, memory loss, and nausea after the procedure. Joe recalls that

at his most recent ECT, on February 23, 2022, he could not catch his breath before the anesthesia kicked in, and that for quite some time afterward he suffered from bad headaches and memory loss. Feeling unwell was nothing new to Joe, but the memory loss is what scared him the most. This is because Joe's mother passed away in February of 2019, and all that Joe has left of her are memories. Dealing with memory loss from ECT frightened Joe, as he became concerned about the possibility of losing his most valuable memories of the most important person in his life.

Joe has taken a proactive role in his mental health treatment by continuing to try to find long-term solutions and by working closely with his providers to ensure that he continues to make progress. Since his release on this case in March 2022, he has continued to engage with mental health treatment and consistently takes his medications. He spent the past fifteen months fully engaged in mental health treatment, demonstrating how seriously he takes his treatment and his efforts at managing his mental health diagnosis.

Despite the intensity of Joe's mental health issues, he has always tried to work and maintain employment throughout his life. After working for a trucking company, a shipyard, and General Motors, Joe got to a point where his mental health prevented him from being able to continue full time work. He applied for and received Social Security Disability benefits. Priding himself on his work ethic and his blue-collar roots, Joe had recently been doing odd jobs to make extra money and keep busy. Social Security disability benefits are Joe's primary means of income and how he has been able to keep a roof over his head and food in his stomach. Joe feels a deep sense of shame and inadequacy for receiving disability benefits because he is unable to maintain steady employment because of his mental health disorders. These feelings of shame and inadequacy were heightened at the time Joe committed the instant offense.

### III. Nature of the offense

Isolated in his apartment in Binghamton, New York, during a global pandemic, Joe grappled with his mental health for quite some time. Because Joe is a diabetic with high blood pressure, he was

4

vulnerable during the COVID-19 pandemic. Fully aware of his chronic health issues and the serious risk he faced if he contracted COVID-19, Joe isolated himself as much as possible to avoid infection. This isolation, while done with good intentions, would end up exacerbating his pre-existing mental health issues, which only led him to isolate even further. In turn, his family members could not see any of the warning signs that his mental health was spiraling downwards, and that he was in serious need of help. One night while alone in his apartment, Joe was watching videos on YouTube, as he often did to pass the time. He came upon videos produced by then-candidate Marjorie Taylor Greene. He was already familiar with her, as he had previously seen videos of her filming herself harassing David Hogg, a survivor of the Marjory Stoneman Douglas High School shooting, who was present in Washington, D.C., advocating against existing gun policies.[1] Video available at https://tinyurl.com/JMMTG2 (paste link into internet browser to view). During that incident, Greene called Hogg, who was suffering from PTSD as a result of the school shooting, a coward. *See* https://amp.cnn.com/cnn/2021/01/27/politics/marjorie-taylor-greene-david-hogg-video/index.html. Greene had previously called Hogg "#littleHitler," for his gun reform advocacy. *Id.*

That night, Joe viewed an advertisement of Greene's during which she steps out of a Humvee and lifts a military-grade sniper rifle. She goes on to say, "Joe Biden armed an Islamic terrorist nation with $83 billion in weapons, like this one… Now I'm doing a gun giveaway of my own, but for Americans only… I want you to win this 50-caliber rifle the Democrats will ban if they keep the House next year." Video available at https://tinyurl.com/JMMTG1 (paste link into internet browser to view). Viewers could enter a raffle to win the gun by visiting a website, GreeneGun.com. Before

---

[1] In 2018, Greene promoted the conspiracy theory that the deadly mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida was a "false flag" planned event—an incident that was faked by someone other than the actual perpetrator for the purpose of promoting strict gun control. *See* https://www.mediamatters.org/false-flag-conspiracy-theory/rep-marjorie-taylor-greene-facebook-2018-parkland-school-shooting-was.

shooting the gun, Greene adds, "In 2022, I'm going to blow away the Democrats socialist agenda."[2] She then shoots the 50-caliber rifle at a car with the word "socialism" on it, and the ad ends with the car exploding into smithereens.[3] Isolated and dealing with feelings of shame surrounding his receipt of disability benefits, this ad struck a nerve with Joe. He feels that his disability benefits are a form of socialism, and that without those, he wouldn't have anything.

Regrettably, at 8:32 p.m. that night, Joe picked up the phone and left a voicemail for the Washington, D.C., office of Greene. In that voicemail, he identified himself by name, spelling out his last name, and provided his phone number. Joe ended the voicemail by stating, "And I would watch yourself with your fucking hatred, you piece of shit. Watch your ass, bitch." Joe called the same number six more times that night, at 8:37 p.m., 11:11 p.m., 11:18 p.m., 11:24 p.m., 12:01 a.m., and 1:10 a.m. In six of the seven voicemails, he identifies himself by name; and in three of the calls he provides his landline number from which he was calling.

The voicemails identify the source of his frustration, as he references the 50-caliber gun, Greene's messages of hate, and her incitement of violence. All seven calls were placed in a five-hour span during the night of March 3, 2022, into the early morning hours of March 4, 2022. No further calls to that number were placed. Upon his arrest on March 16, 2022, Joe admitted to law enforcement that he was the person in the recordings, and that he was upset with Greene because of her remarks to a victim of the Parkland school shootings.

The cumulative effect of Greene's zealous advocacy for violence and domestic terrorism, paired with Joe's history of mental health issues and isolation during a the COVID-19 pandemic, created a

---

[2] Greene advocated for violence against her political opponents while campaigning. *See* https://www.cnn.com/2021/01/26/politics/marjorie-taylor-greene-democrats-violence/index.html; https://www.politico.com/news/2020/9/04/facebook-removes-candidates-squad-post-409175.

[3] This was not Greene's only AR-15 advertisement. *See* https://www.timesfreepress.com/news/local/story/2020/jun/05/facebook-deletes-marjorie-greene-ad-inciting/524666/.

perfect storm which led to this indictment. Alone in his apartment during a global pandemic, being engulfed by political rhetoric and hate-filled messages from Greene, Joe's diminished mental capacity contributed to his decision to make the phone calls. He regrets his actions to this day, and still is in disbelief that he would do such a thing.

Joe can't change who he is or how he was raised, and he will always fundamentally disagree with those who advocate for hate. What Joe *can* do is work on his mental health and coping skills to avoid losing control when he feels hopeless. He has done so by continuing to attend his mental health treatment appointments with both his therapist and psychiatrist, and by abiding by all other conditions of his pretrial release. While people like Greene will always exist and may never be held accountable, Joe has demonstrated that he will hold himself accountable and has done so by entering a plea of guilty, successfully engaging in treatment, fully complying with the conditions of pretrial release for the past 15 months, and ceasing all behavior similar to the behavior alleged in the indictment.

    **IV.    The PSR incorrectly calculates Joe's Guideline range**

        **a.    The offense is better characterized as a single course of conduct rather than a determinate number of threats**

The PSR applies two enhancements to the base offense level which account for a total of 8 additional levels. Neither enhancement is appropriate. The first enhancement is a 2-level enhancement pursuant to U.S.S.G. §2A6.1(b)(2)(A). This section provides for a 2-level increase if the offense involved more than two threats. The conduct in this case is better classified a single course of conduct, rather than any determinate number of threats. Joe's calls occurred over the course of five hours and ceased after the seventh. Each voicemail reveals his general frustration with Greene, his disapproval of her rhetoric of hatred, and her encouragement of violence. The nature and content of the messages were nearly identical; there are no distinguishing characteristics among the phone calls. The three calls serving as the basis for the three-count indictment all involve generally

the same threat. (Count 1: "…. If you keep up with this hatred and people get hurt, I'm gonna hurt you. Physically, I'm gonna harm you."; Count 2: "I think I'm gonna have to show you, to your face, right up front, what violence truly is, and I don't think you're gonna like it… Keep spreading that hate, bitch. See what the fuck happens to you. You are going to get fucking physically hurt."; Count 3: "You're just causing hatred, you're gonna cause people to get hurt, so I'm gonna have to hurt you physically… You're a fucking hate monger, and you're gonna pay for your words."). The voicemails are all intertwined with each other, and some pick up where the previous one left off. On two voicemails he is cut off by the time limit on the machine. Because this is better characterized as a course of conduct spanning five hours with no intervening events or distinguishing characteristics between the calls, this enhancement should not apply.

In other areas of criminal law, multiple discrete acts by a defendant are punished in the aggregate. An analogous situation would be a defendant who burglarizes ten storage units throughout the course of one evening, like the defendant in *Wooden v. United States*, 595 U.S. \_\_\_\_ (2022). In *Wooden,* the defendant burglarized ten units in a single storage facility in one evening. He later pled guilty to ten counts of burglary, one for each unit, which caused problems during a later conviction involving enhanced penalties under the Armed Career Criminal Act. While *Wooden* analyzes separate occasions through the context of the Armed Career Criminal Act, which is inapplicable here, the analysis is logical to apply in this situation as well. In concluding that convictions arising from a single criminal episode can only count once under the Armed Career Criminal Act, the Supreme Court used the analogy of a wedding. The Court detailed how a wedding can encompass "multiple, temporally distinct activities" including a ceremony, a cocktail hour, dinner, and dancing. The Court elaborated that these "doings are proximate in time and place" and their connections are what makes them part of a single event despite not occurring simultaneously. Most strikingly, the Court noted that the more similar or intertwined the conduct giving rise to the offenses, the more apt they are to compose one occasion.

The *Wooden* analysis applies here. Joe left seven voicemails with the Washington, D.C., office of Greene starting at 8:32 p.m. on March 3, 2022, and ending at 1:01 a.m. on March 4, 2022. The course of conduct lasted five hours, contained nearly identical language, reflected that some voicemails were picking up where previous voicemails left off, and were generally one course of conduct rather than separate threats. *Wooden* is just one example of a situation where a defendant is punished for the aggregate harm despite the occurrence of multiple acts. Other examples include defendants charged with one count of assault for the totality of their conduct and not a single count for each punch; defendants in drug cases who are punished for the aggregate weight of the drugs involved despite the presence of multiple instances of distribution; and defendants in false statement cases who are charged with one count of making a false statement for the entirety of the statement, not multiple counts for each falsity. This notion of punishment in the aggregate for a course of conduct despite multiple acts is well-established in criminal law, and is a good analogy to the facts present here. Because the conduct here is better viewed as a single course of conduct which encompassed seven voicemails, and the conduct did not involve more than two threats, and this enhancement should not apply.

The Government cites to *United States v. Montague* in support of its contention that the PSR appropriately applied the 2-level enhancement. 234 F.3d 1263 (2d Cir. 2000). *Montague* is an unpublished opinion that does not reach the issue present here. Rather, the Court relied on previous threats *not* contained in the single phone call to justify applying the enhancement. *Montague*, 234 F. 3d 1263 ("Without reaching Montague's contention that multiple threats made during a single conversation are insufficient to invoke this enhancement, the district court had before it evidence not only of a variety of threats made by Montague for the first time during a April 20, 1999 recorded conversation, but also Montague's prior threats to cut the judge's brake lines, burn down his home, direct a sniper to assassinate him, and other threats included in a coded list used by Montague to communicate with his cell-mates, all supporting an enhancement under U.S.S.G. §2A1.6(b)(2).").

9

### b. The offense was not motivated by Greene's status as a government employee

The PSR further applies a 6-level enhancement pursuant to U.S.S.G. §3A1.2(a) and (b), which also does not apply in this case. U.S.S.G. §3A1.2(a) provides for a 3-level enhancement if (1) the victim of the offense was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivisions (A) or (B), and (2) the offense of conviction was motivated by such status. An additional 3 levels are added under U.S.S.G. §3A1.2(b) if both subsections (a)(1) and (a)(2) apply, and the applicable Guideline is from Chapter Two, Part A.

There is no doubt that Greene was a government officer or employee at the time of the offense, satisfying the first prong under U.S.S.G. §3A1.2(a)(1). However, the conduct in this case fails to meet the second prong under U.S.S.G. §3A1.2(a)(2), because the offense was *not* motivated by her status as such. As evidenced by the voicemails themselves, his statement to law enforcement immediately upon his arrest, and his statement to probation demonstrating acceptance of responsibility, the offense was motivated by actions that Greene undertook that bore no relation to her status as a government officer or employee. Specifically, the offense was motivated by (1) Greene's remarks to a victim of the Parkland school shooting that Joe saw on the news, and (2) Greene's ad where she shot an assault rifle at a car that had the word "socialism" on it. Greene's remarks to a victim of the Parkland school shooting happened on March 25, 2019, before she was even elected to public office. Further, even if she had been a government employee at the time she made these remarks, her conduct would have been outside the scope of her employment or her duties as a Congresswoman.

The ad involving the firing of a military-grade weapon at a car with the word "socialism" on it was published to YouTube on September 16, 2021, while she was in public office. However, the ad was not connected to any legitimate performance of official duties. The raffling off of military-stye assault weapons is not in any way connected to a congressperson's job duties or status as a

government employee. Subject to the laws applicable to the distribution of firearms and assault weapons, Greene could have engaged in this conduct as a private citizen. Members of the House of Representatives have never been tasked with distribution of military-grade firearms to the general public via raffle. Moreover, elected officials are not expected to, or even asked by their voters, to incite members of the opposite political party with insults or videos which imply the approval of violence.

Since his arrest, Joe has explained that this offense was motivated by Greene's remarks to a school shooting victim, and her publication of an ad in which she raffles off a firearm after shooting a vehicle labeled "socialism." Joe felt threatened by the firearm ad, as he views the disability benefits he receives for his bipolar disorder as a form of socialism, and felt like he was threatened by Greene blowing up a vehicle labeled "socialism."

The role of mental health also cannot be overstated as a motivating factor in the offense. It is abundantly clear that Joe has struggled with his mental health for a significant period of his life, and his mental health was in a downward spiral during the COVID-19 pandemic. The week prior to leaving the voicemails, Joe had a terrible ECT session where he woke up unable to catch his breath and suffered from headaches and memory loss for quite some time after.

The Government cites to *United States v. Salim* in support of its argument that the PSR correctly applies the 6-level enhancement. 287 F. Supp. 2d, 250 (S.D.NY. 2003). In *Salim*, the defendant attacked a corrections officer at the jail he was housed at, in order to obtain the keys to the doors at the corrections facility. His crime *necessarily* involved an official victim, because only a corrections officer would have keys to the facility, which was his motivation for the attack. The Court noted such, acknowledging that the defendant knew the victim was an official, and his "actual knowledge of Officer Pepe's official status and his motivation to attack Officer Pepe for reasons that required his victim to be an "official" within the meaning of U.S.S.G. §3A1.2 meets an elevated standard for 'motivated by status'…." *Salim*, 250 F. Supp. 2d at 307. The distinction here is that Salim's offense

11

necessarily required an official victim, because no other victim would have the keys to the facility. His offense was always going to be motivated by the status of the victim because no other type of victim would be able to achieve his ultimate goal of obtaining the keys. The same cannot be said of this offense.

Without these enhancements, Joe's total offense level would be 10, and his Guideline range would be 6-12 months.

V. **Numerous factors demonstrate that a below-Guideline sentence is appropriate**

   a. **For fifteen months Joe has consistently complied with all conditions of his pretrial release and has engaged in post-offense rehabilitation**

Joe was released from pretrial custody on March 22, 2022, after his detention hearing. As part of his release, Joe agreed to abide by several conditions of release, including engaging in mental health treatment, submitting to drug and alcohol testing, and participating in home detention and location monitoring. *See* Dkt. No. 16. By the time of his sentencing, Joe will have spent more than 15 months successfully complying with all of his pretrial release conditions, without incurring a single violation. Joe's full compliance with his conditions of pretrial release demonstrate to the Court that he is able to live in the community successfully, and is committed to working on his mental health. He has spent the past 15 months successfully engaging in mental health treatment, working closely with providers and following their recommendations. During his time on pretrial supervision, Joe also taught himself how to restore guitars. He restored several guitars that he hopes to one day sell on eBay, in an effort to keep himself busy and keep his mind sharp. He has also received consistent support from his family, as he is no longer isolating himself due to the pandemic.

Joe was given an opportunity to prove himself on pretrial release and he has seized that opportunity and demonstrated to the Court that he is able to live in the community, engage in mental health treatment, learn new hobbies, keep himself productive, and make good choices.

His exemplary behavior on pretrial supervision is a good indicator for his low risk of recidivism because it illustrates his ability to comply with conditions and to work with probation to achieve his goals. His good behavior on supervision is a positive factor to be considered in sentencing, and justifies a below-Guideline sentence of time-served with a period of supervision to follow. *See United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (below-Guideline sentence to include incarceration and home detention reasonable because of defendant's behavior on pretrial release which showed defendant unlikely to reoffend); *United States v. Baker,* 502 F.3d 465 (6th Cir. 2007) (where defendant facing Guideline range of 27-33 months for possession of an unregistered firearm, below-Guideline sentence of probation with house arrest proper because he behaved "exceedingly well" while under supervision of pretrial services.").

### b. Prison time is more significant for a first-time offender

The instant conviction is Joe's first criminal conviction. Twenty-one years ago, in 2002, he was twice convicted of Harassment in the Second Degree, which is a violation-level offense and not considered a crime under New York State law. Prison time would be more significant for someone like Joe than for someone who has previously been incarcerated. Consideration of the significance of prison time for a first-time offender is consistent with 18 U.S.C. § 3353's directive that the sentence reflect the need for just punishment and adequate deterrence. *See e.g., United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming below-Guideline sentence in child porn distribution case because the district court's finding that a prison term would mean more to the defendant than to other defendants who have been previously imprisoned was significant.); *United States v. McGee*, 479 F.Supp.2d 910 (E.D.Wisc. 2007) (below-Guideline sentence in heroin distribution case because the defendant had never been to prison, and "generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend.").

13

Due to the instant conviction, Joe is now a convicted felon. By virtue of his conviction, he has lost valuable civil rights. He can no longer serve on a jury, he may lose the right to vote, and he may be prohibited from holding certain professional licenses or doing business with certain governmental entities. Even after serving a formal sentence, Joe's debt to society will never be viewed as paid. He will endure "new forms of punishment capable of generating more anger, more shame, and the scars of permanent social stigma." ERNEST DRUCKER, A PLAGUE OF PRISONS 130 (2011). Convict status "serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave." Wayne A. Logan, *Informal Collateral Consequences*, 88 WASH. L. REV. 1103, 1107 (2013). Joe has demonstrated that being prosecuted and convicted of a federal felony has deterred him from engaging in the same conduct. He was given an opportunity to prove himself on pretrial release, and has fully complied with all conditions of release for the past 15 months. Society would benefit more from his continued engagement in outpatient mental health treatment with established providers, and his continued efforts at learning new skills, than his incarceration.

### c. Sentences that are too long are deleterious to public safety and promote the learning of undesirable behaviors while incarcerated

If Joe is sentenced to serve time in prison, he will have to adjust to a new life -- a life behind bars that will force him to learn behaviors that are undesirable in a free society and abandon the behaviors that have served him well on pretrial release. Studies have shown that modern incarceration tends to make prisoners more prone to violence and anti-social tendencies -- achieving the exact opposite of what a society would hope for in a system that should prioritize rehabilitation. *See, e.g.,* Justin Murray, *Reimagining Criminal Prosecution*, 49 AM. CRIMINAL L. REV. 1541, 565 (2012) ("rather than rehabilitating prisoners, modern incarceration tends to make prisoners more violent, antisocial, and prone to criminality."); Sharon Dolovich, *Exclusion and Control in the Carceral State*, 16 BERKELEY J. OF CRIMINAL LAW 259 (2011)(discussing "the self-defeating nature of current carceral practices -- the way the combination of prison conditions and postcarceral burdens ensures

that many people who have done time will return to society more prone to criminal activity than previously."); *United States v. Bannister*, 786 F.Supp. 2d 617 (E.D.N.Y. 2011) ("[r]ecidivism may be promoted by the behavior traits prisoners develop while incarcerated."); Testimony of Pat Nolan, Vice President of Prison Fellowship at the Joint Economic Committee of the U.S. Congress, "Mass Incarceration in the United States: At What Cost?" October 4, 2007 ("most inmates do not leave prison transformed into law-abiding citizens. In fact, the very skills inmates develop to survive inside prison make them anti-social when they are released.").

In general, sentences that are too long are deleterious to public safety, and turn non-violent offenders into anti-social individuals who are a greater danger to society than when they first entered prison. *See* U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Options Under the Guidelines* (1996) (recognizing the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."); *see also* Dan Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer,* The Vera Institute (July 2017), *available at* https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (concluding that increased incarceration has marginal-to-zero impact on crime, and in certain circumstances, increased incarceration can and does lead to an increase in crime.) The non-rehabilitative aspects of a prison sentence should be considered in imposing a below-Guideline sentence, especially for an individual who has proven that he can put the necessary effort into living a peaceful and productive life in the community.

### d. Joe is statistically unlikely to reoffend

As a fifty-one-year-old man, Joe is statistically less likely to reoffend based on his age alone. Studies have shown that recidivism rates decline relatively consistently as age increases. U.S. SENTENCING COMMISSION , MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (2004) (noting that defendants over the age of forty exhibit markedly lower rates of recidivism when compared to

younger defendants); U.S. SENTENCING COMMISSION, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS (2017) (noting that reconviction rate is highest among offenders younger than twenty-one and declines in each subsequent age group with a reconviction rate of 12.2% for defendants who were between the ages of 50 and 59 when they were released).

Joe's age, health problems, and commitment to living peacefully in his community justify a below-Guideline sentence of probation. *United States v. Berry*, 565 F.3d 332, 341 (6th Cir. 2009)(noting that observers of the criminal justice system have long acknowledged the argument that "elderly offenders pose so low a risk to the public that long or otherwise harsh sentences have little to no utilitarian benefit.") ; *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006)(below-Guideline sentence appropriate for 67-year old defendant convicted of mail fraud because his age and health issues reduced his risk of reoffending").

The fact that this is Joe's first criminal conviction is significant, not only in terms of deterrence but also in terms of recidivism. *See* U.S. SENTENCING COMMSSION, RECIDIVISM AND THE "FIRST OFFENDER" (2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf. ("The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.") The likelihood that a defendant will engage in future criminal conduct is a "central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 131 S.Ct. 1229, 1242 (2011). A below-guideline sentence may be appropriate where a defendant has a low risk of recidivism. *See, e.g., United States v. D.M.*, 042 F.Supp. 2d 327 (E.D.N.Y. May 1, 2013) (where young child porn defendant facing guidelines of 78-97 months, a sentence of probation was appropriate in part because there was little likelihood he would engage in

16

future criminal conduct); *United States v. Cabrera*, 567 F.Supp.2d 271 (D.Mass. 2008) (defendant convicted of possession with intent to distribute facing guideline sentence of 70-78 months, Court imposed sentence of 24 months in part because recidivism concerns "compel a sentence still substantially" lower).

### e. There is no relationship between sentence length and deterrence

Further, empirical research shows no relationship between sentence length and deterrence. In a pre-Guideline study of specific deterrence, which involved white collar offenders, no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

In addition to the ineffectiveness of imprisonment on specific deterrence, an over-emphasis on general deterrence poses an ethical problem of punishing one individual to promote the deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, The Science of Right 195 (W. Hastie trans., 1790). These factors weigh in favor of a below-Guideline sentence.

### f. Joe's existing mental health treatment is the most effective form of treatment

18 U.S.C. §3553(a) directs the Court to consider the need to provide the defendant with needed medical care or other correctional treatment in the most effective manner. 18 U.S.C.

§3553(a)(2)(D). Joe has been engaged in mental health treatment with his current providers since 2019. He has developed working relationships with his providers during this time and is able to work productively with them to develop treatment plans. If Joe is sentenced to prison, there will be a disruption in his mental health treatment that will be difficult to overcome. Researchers have become increasingly aware over the past two decades that continuity of care improves the outcome for treatment of people with mental illness. *See, e.g.,* Carol E. Adair, et al., *Continuity of Care and Health Outcomes Among Persons with Severe Mental Illness*, Pysch. Services (Sept. 1, 2004), *available at* https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.56.9.1061. Studies have found that improving continuity of care in mental health care may contribute to substantially decreased mortality, particularly for patients with disorders such as bipolar disorder. *See* N. Hoertel, et al., *Poor longitudinal continuity of care is associated with an increased mortality rate among patients with mental disorders: Results from the French National Health Insurance Reimbursement Database*, 29 European Psychiatry 6, 358-64 (Aug. 2014), *available at* https://pubmed.ncbi.nlm.nih.gov/24439514/.

     Joe's current engagement with mental health treatment has been successful by any measure. He attends all his appointments, is truthful and forthcoming with his providers, takes their recommendations seriously, and reaches out for extra support when he needs it. To disrupt the working relationship he has built over several years with his providers would be detrimental to Joe. A break in the continuity of his care while incarcerated would mean he would lose necessary treatment and must restart with new providers upon his release. A sentence of time-served with a period of supervision to follow would allow Joe to continue his mental health care with the providers who know him best and have effectively worked with him to manage his diagnoses. This is more beneficial not only to Joe, but also to society as proven by Joe's law-abiding behavior during the pendency of this matter.

Further, it is indisputable that incarceration has serious and long-lasting effects on mental health. This is due to several factors including feeling a loss of purpose, a loss of sense of self, the separation from loved ones and feelings of isolation, exposure to violence, and lack of mental health treatment. *See generally,* LIEBLING & MARUNA, THE EFFECTS OF IMPRISONMENT (2005) (analyzing the complex psychological harm caused by imprisonment and confirming that imprisonment has a variety of negative effects on mental health both during and after incarceration, and that for older prisoners who are unfamiliar with prison culture, the prison sentence "represents nothing short of a disaster, a catastrophe, and, in consequences, they are often in a psychological state of trauma."), *see also* Schnitter, Massoglia, and Uggen, *Out and down: incarceration and psychiatric disorders*, 53 J. HEALTH SOC. BEHAV. 448 (2012); Craig Haney, *Prison Effects in the Era of Mass Incarceration*, 20 PRISON J. 1 (2012); Diana Johns, *Confronting the Disabling Effects of Imprisonment: Toward Prehabilitation*, 45 SOC. JUST. 27 (2018). This science proves that incarceration will only serve to destabilize Joe's mental health disorder, contrary to 18 U.S.C. §3553(a)(2)(D)'s directive that the sentence imposed must "provide the defendant with needed …medical care, or other correctional treatment in the most effective manner."

## CONCLUSION

For the above-listed reasons, a variance from the Guidelines to a below-Guideline sentence of time-served to be followed by a period of supervision is sufficient, but not greater than necessary, to achieve the purposes of the Sentencing Reform Act.

DATED: June 20, 2023

Respectfully submitted,

Lisa Peebles
Federal Public Defender

By: Gabrielle DiBella
/s/ *Gabrielle DiBella*
Assistant Federal Public Defender
Bar Roll No. 700576
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
(315) 701-0080

cc: Richard Southwick, AUSA, by ECF
Joe Morelli, by mail